calling case number 255037 et al. Kathy A. Harris in her personal capacity and her official capacity as member of the Merit System Protection Board versus Scott Besant in his official capacity as Secretary of the Treasury et al. appellant. In case number 255057, Gwen A. Wilcox v. Donald J. Trump in his official capacity as President of the United States and Marvin E. Kaplan in his official capacity as Chairman of the National Labor Relations Board appellant. Mr. McArthur for the appellant, Mr. Zielinski for Apley Harris, and Mr. Gupta for Apley Wilcox. All right, Mr. McArthur, good morning. Good morning, your honors, and may it please the court. Eric McArthur for the defendants. The court should stay the judgments below pending appeal because the government is likely to prevail on the merits and because the balance of harms and the to prevail for two independent reasons. First, because Article II empowers the President to remove members of the NLRB and MSPB at will. And second, because even if that were not the case, the reinstatement remedies ordered below are improper. As to the first point, the government is likely to prevail because the four cause removal restrictions for members of the NLRB and MSPB unconstitutionally infringe on the President's core Article II authority to supervise principal officers who wield his executive power on his behalf. The Supreme Court has been quite clear that the President's unrestricted power of removal is the general rule, or as this court called it in Severino, the presumptive rule. That rule flows from the text of Article II, which vests the entirety of the executive power in the President, and from the need to ensure that executive officials who wield power affecting the lives and livelihoods of American citizens remain accountable to the democratically elected President. I think Judge Henderson may have been trying to ask a question. Oh, I'm sorry, I didn't hear. Sorry. Mr. McArthur, could the President decide that he wasn't going to appoint or allow to remain in office any female heads of agencies or any heads over 40 years old? I think that that would be within the President's constitutional authority under the removal power. There would be separate questions about whether that would violate other provisions of the Constitution. But of course, the President would have to go there because the 14th Amendment came after Article II, and that's not this case. I'm not saying how it would come out, but it would not be the same as a last-in-time statute in conflict with the Constitution. It would be a last-in-time constitutional provision, arguably, in conflict with a previous one. I mean, that would be the analysis. You would have to reconcile the 14th Amendment versus the removal power. And as we know, the 14th Amendment has been applied to the federal government for the Due Process Clause. I think that would be the analysis. But of course, as Your Honor mentioned, we have nothing like that here. What about the over 40 part? All you need is a rational basis under the Constitution. Is a desire to exercise my removal power a rational basis? I think it might well be a rational basis. So at least as to Judge Henderson's question as to firing everybody over 40, that is your view as of now at least. Well, I don't want to get out over my skis here. Obviously, all of these are sensitive questions when the Department makes decisions about this. This is made at the very top, the Acting Solicitor General. I do not want to get out in front of the President or the Acting Solicitor General on any of these issues. I'm trying to wrestle with how reasonableness review applies to the President's exercise of the removal power, which doesn't have to give any reasons under your theory. I mean, that is right. The Supreme Court has been clear that the presumptive rule is that it is an unrestricted power of removal. But the question we have here isn't about whether that that power has trenched on some other provision of the Constitution. It is whether Congress can constitutionally restrict that power through a provision that says the President may only remove one of these members for cause, for malfeasance or inefficiency or neglect of duty. And the Supreme Court's precedents have been quite clear that to date, the Court has recognized only two exceptions that allow Congress to come in and regulate that otherwise unlimited power of removal. One is for inferior officers and one is for multi-member expert agencies that do not wield substantial executive power. There's no dispute here that plaintiffs are principal rather than inferior officers. They are agency heads who answer to no one but the President. So the first exception clearly does not apply. Instead, this case turns on the issue that you flagged, Judge Walker, in your concurrence in San Marino as an issue for another day. That day has now come. And the question is, what is the scope of the Humphrey's executor exception in light of the Supreme Court's most recent precedents? And our principal guide on that question is the Supreme Court's decision in Selah Law, where the Court carefully reviewed the decision in Humphrey's executor. And this is how the Court summarized its analysis of what that opinion stands for. The Court said that was an exception that permitted Congress to give four cause removal protections to a multi-member body of experts balanced along partisan lines that performs legislative and judicial functions and was said to not to exercise any executive power. Or in shorter compass, the Selah Law Court described the exception as one for multi-member expert agencies that do not wield substantial executive power. Now, I'm not certain whether that substantial part of the formulation survived the Court's subsequent decision in Collins, but whether it did or not, I don't think makes any difference in this case, because even if the test is substantial executive power, both agencies here clearly wield substantial executive power and power that goes well beyond the powers that were considered by the Court as the basis for its decisions in Humphrey's executor and subsequently in Weiner. If all the entity does is adjudicate disputes applying the law that Congress has prescribed to facts that it may find, how is that wielding executive power within the meaning of Humphrey's and Weiner? So the Supreme Court has told us in cases like City of Arlington that even if an executive agency is doing things that take on judicial or legislative forms under our constitutional structure, those exercises of power are and must necessarily be exercises of the executive power. And that is why the Supreme Court's decisions have repudiated the central plank on which Humphrey's executor stands. I think the Court has left... They've done that, but said time and again and again that we're not touching Humphrey's executor. That's still precedent. Now, I understand you want to make marked arguments to the Supreme Court, but this Court is bound by Supreme Court precedent until the Supreme Court says otherwise. And given that it has in CELA law, and even again in Collins, said this precedent is still on the books, what authority does this Court have to say, you are just kidding. That's how we're going to interpret it. You really meant for us to cast aside what you have kept in place. So I have no quarrel with you, Judge Millett, that you are, of course, bound by the Supreme Court's precedents, their holdings in those cases, unless and until the Supreme Court decides to overrule them. And we're not asking you here to do anything inconsistent with the holdings of Humphrey's executor or Weiner. We are instead asking you to apply those cases as they have been clarified by the Supreme Court in CELA law. And I will say, frankly, that I think the Supreme Court has left the lower courts in something of a tough spot here, because it has left those holdings in place while repudiating their rationale. The central plank of the rationale of Humphrey's executor was that the FTC occupied no place within the executive branch and exercised no part of the executive power. That's because you have to just read the whole decision, though. And again, in Weiner, it was quite clear that what we mean is, in Weiner, the commission said all we do is adjudicate cases according to the law and find facts. And that is sufficient. And the CFPB wasn't adjudicating anything in CELA law. They were adjudicating authority in columns. And so neither of them could speak to what happens when you have sort of quintessentially adjudicated bodies, like the MSPB and NLRB. As to those types of bodies, we have to stick with Humphrey's and Weiner. Well, both of the bodies here exercise powers that go well beyond adjudicatory powers. So we can come back to that. But as to your Honor's question about... Predominantly is what the test was. Perhaps predominantly. And Weiner. The MSPB and NLRB, the board as it acts, is predominantly adjudicative. The MSPB, that's all it does. Well, it's not all it does. It makes some rules to govern its own proceedings, as does this court. It does some other things that are executive powers. But to go back to your Honor's point about... Not predominantly. I agree with that. I think the MSPB is predominantly an adjudicatory body. But the issue here is how you apply the Supreme Court's precedence when the holdings are left intact, but the rationale has been repudiated. I'm not sure. And I'm quarreling with that. Our test for whether the Supreme Court has gotten rid of something is pretty strict. We don't get to treat it like some kind of Rorschach test and we see in it whatever we wish. It has got to be pretty strict. And when the other cases haven't involved adjudicatory bodies like these two at all, you've got no precedent dealing with adjudicatory bodies, predominantly, as you just said, adjudicatory bodies since Weiner. And we're having to do an awful lot of surgery that the Supreme Court has said, don't bother. Humphreys and Weiner are still precedent. I'm just curious why the Justice Department thinks that courts of appeals have the ability to do what the Supreme Court itself has again and again expressly declined to do. So we don't think that this court has any authority to overrule the holdings of Humphreys or Weiner. The cases here are materially distinguishable from those facts, from the facts that were presented in both of those cases. Well, I'm sure they may do less than the FTC does. No, I disagree with that, Judge Millett. I mean, if you want to compare, let's compare, for example, the MSPB to the War Claims Commission that was at issue in Weiner. And I think we should compare it on two axes, both looking at and evaluating the nature of the adjudicatory power that the two bodies exercise, and then looking also at the additional powers that the MSPB exercises that weren't exercised by the War Claims Commission. So starting on the first one, the War Claims Commission was a time-limited body that existed for just a few years, essentially to distribute money in a fund to people who had been injured in World War II. That sounds pretty executive or legislative. Well, I think it was definitely, we would definitely understand that today as executive power, but it was a very narrow scope executive power, whereas the MSPB is a permanent body that has the charge to apply and interpret. But what does permanence or length of time have to do with whether it's trenching on your vision of removal power? I think we're looking at the scope of the power entrusted to that body. Okay. So if they just, if they created an MSPB and it did exactly what it does now, but it only operated as many years as the War Claims Commission did. I think that's one of the factors you could take into account. Would that change the outcome? I don't know that that one by itself would change the outcome, but I do think- Has the Supreme Court ever said how long something is acting? I don't think the Supreme Court- It's been around a very long time. That's true. I don't think the Supreme Court has addressed that, but I'm just pointing out ways in which this body differs. That could be a basis for saying the logic or the holding of a cleaner definite extent. I'm finding a difference without a logical rationale as to why it's legally relevant. I think there- Again, something this court shouldn't be doing. I think there is a logical rationale because you are focusing on what is the scope of the power that has been entrusted to that body. Can you give another difference? Sure. It interprets and applies multiple federal statutes, some of them that are quite open-ended. It has the authority to award both affirmative relief and penalties. Penalties is something that War Claims Commission was not doing. None of which are independently enforceable. They can all be challenged in court. NLRB has no effect until it's adopted by a court. They can be challenged in court, but- The War Commission was much more powerful. It had unreviewable authority to make a final, conclusive decision as to money in the executive's hands. The fact that Congress made those decisions unreviewable reflects that Congress thought that that was not that consequential of a power compared to the power that the MSPB is wielding that the Congress said has to be subject to judicial review. Congress thinks it's not a consequential power. I'm still not- I'm not understanding. I understand you're doing your best, but I'm sitting here with Supreme Court precedent, one on each shoulder, multiple on each shoulder, honestly, saying, still lock, still lock, still lock, still lock. There hasn't been a case that has involved a judicatory bodies like this. Still lock, still lock. And I hear you saying things like, well, time and Congress might have thought it wasn't that big a deal. And I'm just having difficulty figuring out how one writes an opinion like that. I think one- Free intellectual integrity. I think one writes an opinion that says we are bound by the Supreme Court's holdings. And that means that if we are presented with the same or a materially indistinguishable set of facts, we must apply those holdings. And so the inquiry then becomes, is the MSPB or the NLRB materially distinguishable from the power- From the CFPB. Very much so. Definitely from the CFPB, but the question here is- But that's what you're relying on. You want us, I take it you want us to take Celia Law and Collins and say those change what happens to adjudicatory or quasi-adjudicatory bodies. But neither of them were, and neither of them look remotely like the entities we have here. Putting aside the signature difference, those were sole heads, which was the central rationale the Supreme Court used in those cases. We're not touching the law on multi-member bodies. I agree with you that far, that the central difference between Celia Law and Collins in these cases is multi-member versus single head. But the court also had a lot to say in Celia Law about the Humphreys executor exception. The court thoroughly canvassed that decision and then summarized what the court today understands that exception to stand for. And then you just agreed that the MSPB is predominantly, substantially undertaking adjudicatory activity. I don't think those categories are mutually exclusive, Judge Millett. I think the adjudicatory power that the bodies here wield is substantial executive power. If we accept that, which is not how the Supreme Court described it as exactly the opposite in Wiener. So if we accept that, then how in my mind do I say the court preserved Humphreys and Wiener intact? What you want us to do is say they said those words, but when you read the analytical decision, they couldn't have meant what they said. And it's so clear that they couldn't have meant what they said when they said, we're keeping those precedents intact. That you, lower court, should disregard what they said when they said Humphreys executor is still in place and say, no, you're wrong. These other parts of your opinion talking about an entirely differently designed body control. I mean, that's what I'm struggling with is you want us to follow Supreme Court precedent, but then not take their words, take them at their word and instead psychoanalyze whether somehow they were subconsciously overruling what they said they were keeping in place. No, I don't think they were asking the court to analyze whether they were subconsciously overruling anything. They obviously did not overrule the holdings of those cases, but they also had some things to say about the reasoning of those cases. And the court was very clear that the central rationale of Humphreys executor did not withstand the test of time. It would have all been dicta. It's not necessary at all to the decision about the CFPB. I think it was very much part of the core reasoning of the case, part of the ratio. Is it necessary to the decision? No, I think you could debate that. A lot of the things that they were concerned about with the CFPB, just don't, none of those apply here. Well, you don't have a single head. You don't have, I mean, it's a fact in sharp contrast to a multi-member body. They said this person makes all the decisions all by herself with no one to check or review which of course doesn't happen in a multi-member entity. And the funding stream was argued to be sort of too siloed off from presidential control. The number of statutes, NLRB has one, and the MFPB just has very narrowly limited to some employment, government employment statutes. CFPB had a broad range. None of these, none of these speak to Humphrey's executor or Weiner or unravel what the Supreme Court said in terms. Let me try it this way, Judge Millett. I agree with you a hundred percent that there are parts of the analysis in SILA law that have no analog here. Some of the things Your Honor just mentioned, but it is also part of the analysis in SILA law, whether or not the CFPB fell within the Humphrey's executor exception as clarified by the court with those two prongs, multi-member expert agency and does not wield substantial executive power. If you look at the court's opinion in SILA law, it marches through both prongs, says CFPB flunks them both. And so when you get to the part of the analysis where they are analyzing that second prong, does the CFPB exercise substantial executive power? That's the part of the analysis that is directly relevant here. What about when the Chief Justice and two other justices said one way to fix the problem in SILA law is to make it a multi-member board or multi-member entity, a point that was joined by the four dissenting justices. So seven justices in SILA law, your central case said we can fix the CFPB's problem, if I think that is too aggressive. A reading of what that part of the opinion in SILA law says. I think the Chief Justice couched that much more tentatively. He said there may be ways that Congress could fix the problem. And he said nothing in our severability analysis, not our merits analysis. He said nothing in our severability analysis forecloses Congress from pursuing other alternative response. Such as? Such as. That's correct. So was the Chief Justice proposing something that could be constitutional or was he engaged in some sort of disingenuous bait and switch? I don't think it's a disingenuous bait and switch. I don't think the Chief Justice is going to say, hey, Congress, here's some ways you can fix this. For example, when, if, under your theory, the reading you want us to drop of SILA law, if the Chief Justice knew that would be just as unconstitutional. Well, maybe he didn't know it would be just as unconstitutional. But if he didn't know that SILA law made these things, multi-member boards, unconstitutional, then surely I can't make that decision for him. But he wasn't prejudging the next case. You're asking us to make that. Right. Exactly. That's exactly my point. He's not deciding multi-member boards. That's exactly right. And so why should we? Well, because I think if you look at the merits portion of the analysis, it tells you something about how multi-member boards should be analyzed. Yeah. I read the whole opinion. That's my job. And when it says, here's a fix, Congress, and you want to say, well, I know the Chief Justice wasn't sure about whether multi-member boards would be allowed or not. So we kept Humphrey's executor in place. I mean, all they were doing was saying, well, we will wait and we will decide that very, very difficult and complicated question when presented with it, just like Judge Walker mentioned in San Marino. When it comes up, we'll decide it. But until then, this precedent is in place. And that, if it's unsure for the Chief Justice, no way we can say, actually, it was clear. So clear that we can depart from your rule that courts of appeals not overrule, bypass Supreme Court precedent until the Supreme Court has had its first, it gets, it gets first bite. I'm not saying that it's clear. I think I said at the outset that I think the Supreme Court has left the lower courts in a bit of a tough spot here, figuring out how to apply this. Which way are courts supposed to go? I thought the Supreme Court told us that until we have overruled it, which would be quite clear, you guys follow the existing law. Absolutely. Follow the holdings. But I think you also have to follow the part of the court's analysis. The severability part of the holding? No, the merits part of the analysis. Where have they said you only follow certain parts of opinions? The severability part was a holding. The fact that the removal restriction there was severable was a holding. I don't think the remark that your Honor is focused on is part of the holding. And it was very tentatively couched. There may be. I don't think the court in that one line was prejudging that. They're always going to say that because they don't know how Congress is going to concoct this thing. But, you know, you take that and you put it with the fact that all these adjudicators, they haven't touched the concept of adjudicatory entities at all. But they've given you a touchstone for how to evaluate those bodies. Do they wield substantial executive power? And if you go back to the part of the merits analysis that I was alluding to earlier, the aspects of the powers possessed by the CFPB that distinguish the CFPB from the powers wielded by the FTC as understood in Humphrey's executor. The court said, number one, the CFPB has rulemaking power. Number two, the CFPB has the authority to award affirmative relief in its own adjudication. And number three, it has the power to seek monetary penalties in federal courts. Now, the first two of those apply to both of the agencies before us today. Neither of them have the ability to seek monetary penalties in federal court, but they do have the authority to go to federal court, or at least the NLRB has the authority to go to federal court and get awards that award affirmative relief enforced by the court. And the MSPB doesn't even have to do that. It has the power to enforce its own orders directly, which is a significant executive power that goes beyond any power that either the War Claims Commission or the CFPB or the FTC has. So the CFPB didn't have to go to court before its decisions would have any legal force at all? I believe so. So nothing took effect at all? Subpoenas, any of those things? Oh, I mean, some of the subpoena stuff, but I think their final orders were reviewable in court. Reviewable. I'm distinguishing between reviewable and, as in the NLRB context, actually just don't operate at all. Don't have legal force in their own, like the NLRB. That's right. I don't recall the answer to that question, Judge Millett, whether the CFPB's orders had any effect before they were enforced in court. But I do think as the MSPB, it is important that the orders are directly enforceable by the MSPB. They don't have to get a court to agree before they can enforce. They can order another executive branch agency or an employee to comply with the orders, and they are statutorily empowered to enforce compliance. So the statutory remedy that's mentioned is they can direct that the pay be withheld for an employee who is out of compliance with the MSPB's order. So that's clearly an executive order. What can they do to agency heads or agency officials, people operating in the agency if it doesn't comply? It's the same remedy. I don't know that it reaches agency heads. I'm just, as opposed to the employee, then the people who are running the agency. So it may be a supervisory employee who needs to comply with an order granting relief to a subordinate employee. And if that supervisory employee is failing to comply, the MSPB can say, you don't get a supervisor until you comply. So they have the power to do that directly. Has that ever happened? I'm not aware if it has ever happened or not. I mean, it certainly has been threatened. Mr. McArthur, we're at a stay motion. We're not at the merits stage. So I'd like you to address the irreparable harm factor. It seems to me that there's no irreparable harm on the side of these two agency heads. But what about the irreparable harm to the president? So I think the analysis here very much tracks the analysis in this court's opinion on the Dellinger stay motion. And there as here, here as there, the injury focus factors favor the government. And that's because, as this court recognized, requiring the president to recognize and work with a principal officer whom he has already removed inflicts an irreparable harm that cannot be unwound. President has a short four years to implement the agenda that the American people elected him to implement. And every day that passes with plaintiffs wielding his executive power over his objection is a day that can never be gotten back. On the other side of the scales, plaintiff's loss of employment is not an irreparable harm that can be compensated through back pay if their claims are ultimately determined to be meritorious. And as the court said in the Dellinger stay order, at worst, they will be out of office for a short period of time. So I think the harms here weigh strongly in favor of the government. Well, sorry, were you done with that? How about the fact that this is a multi-member board that cannot function right now because it lacks a quorum? Right. Should we weigh that as harm here? That's not harm to these individual plaintiffs, but at least one of them is claiming to sue in her official capacity. I think that analysis more naturally fits under the public interest prong of the analysis. Wherever you put it, I do think that's something that you can legitimately think about. I think the problem here is that there's going to be disruption for the agency any way that you slice it. So obviously, if they don't have a quorum, there's going to be some business they can't  But the flip side of that is if they are allowed to go forward and conduct business with a quorum composed of agency officials that the president has terminated, there is going to be a heavy cloud of illegitimacy over every official act they take. And those official acts, if we ultimately prevail in this litigation, may have to be unwound, which will cause significant disruption both for the agencies and for the people whom they serve. I also think that the disruption from the lack of a quorum has been somewhat overstated. For example, Harris focuses on the fact that if an employee goes to the MSPB and has a heard by an administrative judge and prevails in front of the administrative judge, and then the government appeals, that can tie up the case until there's a quorum in effect that will allow the MSPB to issue a final order. That's true, but the fact is the ALJ proceedings are ongoing, and under the statute, the default rule is that if the ALJ rules for the employee and awards relief, that relief takes immediate effect and doesn't wait until the appeal proceedings are done before the board. Can I ask a question about how consistent or inconsistent DOJ is being about its view of executive power and the unitary executive theory? I have a case called Secretary of Labor versus KC Transport and Health Review and Federal Mine Safety and Health Review Commission. So what you'll see there is that the Secretary of Labor is on one side of the V, and the Federal Mine Safety and Health Review Commission is on another side of the V. That is arguably an intra-executive branch dispute. Certainly, in the view of the executive that you're asserting today, it would seem to be an intra-executive branch dispute. So I'm wondering if what you're saying today is correct, why is the Secretary of Labor petitioning this court to resolve an intra-executive branch dispute? So I am aware of that case, Judge Walker. I don't know what the answer in that particular dispute is, but I think the issues that are presented there are distinct from issues that are presented with respect to the president's exercise of his free will. Do you think you can be right in this case and at the same time an Article III court can resolve an intra-executive branch dispute? I'm not going to take a position on that other case just because I haven't studied it. I'm not sure how the analysis may diverge, but it does seem to me that those are separate questions. President's removal power versus how it affects the court's Article III jurisdiction or whatever if you have two executive agencies that are before you. I do want to touch on the remedy piece of this because that is a second and independent ground on which we can prevail on the merits before this court and for which I think a stay would be warranted. Because obviously the circumstance that we're here on the stay motion for is that the plaintiffs are today in their posts exercising executive power. And if we're right about the remedy, they shouldn't be there. And so the plaintiffs rely principally on this court's decisions in Swann and Severino. And those decisions don't help them for three reasons. The first is that the release that was ordered below goes significantly beyond what was contemplated in Swann and Severino. Second is that Swann and Severino didn't consider a separate line of authority holding that court sitting in equity has no power through an injunction to interfere with the removal of a public officer. And the third is that Swann, this is input note one, I think made clear that the sort of injunction that the court was contemplating there was a mandatory injunction that would have to meet the same requirements that you need to meet in order to get rid of mandamus. Those are very stringent requirements and the plaintiffs cannot satisfy them here. So on the first point about... Isn't the district court fine, I think in Harris's case that mandamus would be met here? The district court said that in the alternative, it would be prepared to issue a writ of mandamus. But I think that analysis there was wrong. But for purposes of our stay motion, we're not here on the merits of this case. There's no dispute that there's sort of an article three case or controversy that there's some remedy that could be given. You can see the back pay, right? This is a remediable case, a case of controversy for us to be solved. And so I'm just trying... This is starting to sound more like the merits argument rather than a stay one, which I'm just trying to decide... No, I think this is very much... I mean, it is one of the grounds on which we can prevail on the merits of our claim that that relief ordered below was improper. And that is ultimately the relief that we need to stay up. If it had just been, say, a declaratory judgment that, okay, this termination was unlawful and you're entitled to back pay, obviously we'd appeal that. I don't know that we would be here on a stay motion. But you don't even get to rate... I mean, again, for the purposes of the stay, for Wilcox, Ms. Wilcox, you all didn't even dispute the availability of the declaratory judgment in district court. So any argument of the contrary here is forfeited. That's not quite right, Judge Millett, but we did not... What the district court said. Well, the district court, I think, swept a little too broadly with what we had said we weren't disputing. We had said we weren't disputing a declaratory judgment to the effect that the termination was unlawful. But I think if you read the transcript of that hearing, it's pretty clear that any declaratory judgment that goes beyond that, as the judgments that were entered here do, we did maintain our objection to. We said, if you're trying to build relief into a declaratory judgment that essentially says that they're back in office, we maintain our objection to that. That is the principal respect in which the relief ordered below goes beyond what was contemplated in Severino and Swan. So Severino and Swan said that the plaintiffs there had established the Article III element of addressability because the court, in theory, had the power to give at least partial relief by ordering subordinate officials to treat the plaintiffs as de facto members of their board. De facto. The court in both cases drew a very clear distinction between being de facto reinstated and actually being officially clothed with the authority of the office. The decisions below, both of them take that next step here and say, this isn't just de  This is, we are ordering that these plaintiffs remain members of these boards and shall continue to serve as members unless and until they are removed from office. You don't quibble with the de facto. I'm going to put a second. For this prong, de facto, that circuit precedent binding, to the extent the district court's decisions are read as de facto reinstatement and only operating upon other executive officers, you don't quibble. And you don't quibble with the declaratory judgment saying that what happened here was unlawful for both of them. Then it's just the official status. The thing that you're having is sort of de jure. I think de jure is a problem and one of the ways in which this goes beyond severing nuance. I would say that we do accept as a matter of circuit precedent that the court would have power in appropriate circumstances to order that sort of partial relief that was contemplated. But whether the court has power to do it is a separate question from whether it's appropriate. Didn't lose Judge Henderson here. Judge Henderson, are you still on? Yep. Okay, your picture has disappeared. So we wanted to make sure you were still here. I'm sorry, go ahead. But there are the two other points that I wanted to make with respect to the remedy. One is the court in Severino and Swan did not consider this separate line of authority, a longstanding limitation on the power of a court sitting in equity to interfere with the removal of a public officer. This is about public officers generally. It's not just about the president removing agency heads. That's a longstanding equitable doctrine and plaintiffs don't have any persuasive response to it. They point to the Supreme Court's decision in Sampson. But all Sampson said is that in light of the extensive statutory scheme that Congress had enacted for government employees, the court was talking there about the forerunner to the CSRA today, and in light of that statutory scheme for employees, the court said it wasn't prepared to say that Congress had foreclosed all injunctive relief in these personnel cases. We're obviously not dealing here with an employee. We are dealing with agency heads for which there is no comparable statutory scheme. So no question arises here of Congress having displaced that longstanding limitation on the powers of a court sitting in equity. In fact, the Supreme Court's decision in Grupo Mexicano makes clear that those historical limitations on a court's equitable powers persist unless Congress has eliminated them. Not only has Congress not eliminated them in this context, it legislated against the backdrop of those rules, certainly for the NLRB back in 1935, and I think also for the MSPP in 1978. It legislated against the backdrop of that longstanding rule saying a court in equity will not interfere with the removal of a public officer, and it did not displace that rule and it did not enact a reinstatement remedy for violation of the at-will removal provisions that it enacted. I think that counsels strongly against judicial creation of such a remedy, especially in this constitutionally sensitive context involving a president and his exercise of his Article II power, his core removal power. All right, Mr. McArthur, we'll give you a couple minutes in reply if there are no more questions. Thank you, Judge Henderson. Thank you. Mr. Zielinski. Good morning, Judge Henderson, and may it please the Court, Nathaniel Zielinski on behalf of Kathy Harris, a member of the Merit Systems Protection Board. I'd like, if I could, to identify four points, four concessions that my friend on the other side made that doom his request for emergency relief from this court. First, the government is asking to throw out centuries of precedent from Blackstone and Marbury on remedies. Do you think he conceded that? I do. I think when he's saying, what was his exact quote to concede? He accepted swans. That we should throw out Blackstone. That we should throw out Blackstone when he said there's no relief available here. Blackstone was very clear, Judge Walker, that mandamus provides full and effectual relief. Marbury, Chief Justice Marshall, said that it was a plain case. I don't remember him saying, like, we should, you know. He is in this court. The government is in this court telling you that you have no authority, Judge Walker. Go ahead. Well, I can move to, let me move to some other concessions that I think are critical, because they are asking you to throw out Humphrey's executor, Judge Millett. And I didn't hear him to concede that either. Well, I think he said about 25 times, we're bound by Humphrey's executor. So, Judge Walker, then we win this case, because as he said, and he did say this in an emergency state posture, that he said that it is not clear. He said, quote, it is not clear under Celia law that the government should prevail. Well, in an emergency state posture, the government must make a strong showing, Judge Walker, of success in the merits. And you can't skip over that prong. Judge Henderson, you are absolutely right. I genuinely, you know, I think there's a lot of difficult debate about the question of what a strong showing on likelihood of success in the merits means. Do you think that that means a 51% likelihood of success, an 80%, a 30%? So, Judge Walker, in this case, I think we are 100% right. And I'm happy to walk you through Celia law, and I'm happy to walk you through Collins and Wiener and tell you why we are indistinguishable. In fact, Judge Millett, you are right. We are less, we have less power than the War Claims Commission did in Wiener, because our, the decisions of the Merit System Protection Board are reviewable. The War Claims Commission, they were reviewable nowhere. But Judge Walker, to your point, I think given all the concessions that they made about how Celia law didn't predetermine the next case. And in fact, they said over and over that it left Humphrey's executor. They agree that it leaves Humphrey's executor in place. They didn't overrule the, whatever. They didn't overrule all of Humphrey's executor. And as Judge Henderson noted in the Cossum decision, in your en banc dissent, Judge Henderson, when the Supreme Court has left your decision in place, and you think that there are other aspects of another decision that are intention, the prerogative of the overruling the Supreme Court's precedent lies with the Supreme Court. It is not for the Court of Appeals. I think we all recognize that we are a lower court and that we take our orders from the Supreme Court. I think we cannot disregard what Humphrey said. I think we cannot disregard what Celia and Collins said about Humphrey's. So do you agree with that? So Judge Walker, I completely agree that the Celia law decision keeps the traditional rule for multi-member agencies intact. And one of the reasons we know that, and I'd like to walk through the decision with you, but one of the reasons we know that is because Justice Thomas and Justice Gorsuch concur. And they say it leaves the Humphrey's executor in place. I didn't quite hear the answer to my question though. Do you agree that we can, I know you agree we cannot disregard what Humphrey says. I think we take the Chief Justice's decision at face value, Judge Walker. Do you agree we can't disagree with what Collins and Celia say about Humphrey's? And here's what Collins says about the state of the law. And here's what Celia law says. Of course, you have to agree with what the Chief Justice wrote. And what the Chief Justice wrote in Celia law is crystal clear. It says, and this is the separability analysis at 237, Judge Millett. Our separability analysis does not foreclose Congress from pursuing alternative responses. For example, converting the CFPB into a multi-member agency. At page 216, Humphrey's executor permitted Congress to give foreclosed removal protections to a multi-member body of experts. Page 218, the court recognized the lawfulness of quote, multi-member expert agencies that do not wield substantial executive power. 228, we do not revisit Humphrey's executor or any other precedent. Judge Millett, you're absolutely right. You need to overturn Wiener in order to rule against Apolli Harris in this case. I want to move, if I could, to another point that I think is an important concession. My friend on that side agreed that the Merit Systems Protection Board is a predominantly adjudicatory body. That places us squarely within the heartland of the Humphrey's executor framework. Judge Henderson, as you noted in your decision in the PHH Corp case, the Wiener, and in your dissent, you said that the Wiener exception is for primarily adjudicatory bodies. That is precisely what the Merit Systems Protection Board is. Well, let me ask you about that because I'm looking at paragraph 26 of your client's declaration in which she says, I cannot issue adjudication decisions unilaterally. And yet, she unilaterally stayed the termination of thousands of employees, and she is describing that as not adjudication. We are here today on the exact same type of review, that is, whether we're going to issue a stay order. We are clearly adjudicating. And my question to you is, do you think she meant by that the nature of what that board and what she was reviewing was executive? That is the termination or stopping the termination of employees. We are reviewing, no question, the decision of a district judge, and that's adjudication. But I have a hard time understanding how she took the action she did with the stay order, and yet saying she has no authority to adjudicate unilaterally. Judge Henderson, I'd like to discuss the stay motion in a couple of different parts, because I think it's an important part of the case that the government is relying on. The first top-line answer is that courts do this frequently. So the Supreme Court rules, which we cited in our response, provide a single justice the authority to act on stay motions. It is not uncommon. And in this case, Congress said that a single member of the board can provide a temporary stay at the request of OSC. That is definitely an adjudication, because you are adjudicating the stay request. And so, Judge Henderson, I just want to be very clear. We are not suggesting that it's not adjudication. It is 100% adjudication. It is temporary. It can only last for 45 days. Well, what do we do with her declaration that says, I don't adjudicate anything unilaterally? Because it's a temporary— You say she just did. So, Judge Henderson, it's a temporary measure in the same way that in the Supreme Court of the United States, a single justice of a multi-member court has the temporary ability to provide a stay. Is that single justice not adjudicating? So, Judge Henderson, I agree she's adjudicating. I don't think it is the type of issue that was a concern in Celia Law and CFPB, because in multi-member courts, when they're still multi-member, you will sometimes have a single member in an emergency posture handling—and this court may do it as well—a single judge handling an emergency motion. It doesn't change the multi-member nature of the body. The en banc court is still there. It's still a multi-member court. But if you're concerned about the stays, Judge Henderson, the president completely controls the stay process, the ability to request a stay right now, because as a result of this panel's order in the Dellinger case, the president now has an acting special counsel in office. So, the stay can—the president can just now completely control that process, because nobody else except for OSC can walk in and request a stay. So, now that Dellinger is out and somebody else is in, the president completely controls the ability to request stays. Judge Henderson, I'd also like to, if I could, focus on the enforcement aspect. My friend on the other side said that MSPB can enforce orders by withholding salaries. That is not true. Part of the reason that my friend said it has never occurred is because it's unconstitutional. The statute was passed in 1978 before the Supreme Court's decision in Voucher. In 1986, the Supreme Court said that a certification of that type to the Comptroller General was unconstitutional. The reason MSPB has never used that mechanism is because it's an unconstitutional mechanism. And under CILIA law and the court's other precedent, you just pretend it doesn't exist in the statute. I'd like, if I could also, if you think that the test for whether Congress can put removal restrictions on the president is, and I'm going to quote CILIA law, is it a multi-member expert agency that does not wield substantial executive power? I believe that's the test in CILIA law, yes. That's the test we should apply. I think that you're in an emergency stay posture. And I think the easiest thing to do in an emergency stay posture is look at the Supreme Court's other precedent. Supreme Court, Judge Walker has given you guideposts, and so has my friend on the other side. The guideposts in this case are Wiener, the FTC as it existed in the, described in the Humphrey's executive decision, and then the Federal Reserve. Because my friend on the other side agreed that the Federal Reserve is constitutional. And that's a massive- I mean, I think we have to consider them. We have to apply them. They have not been overruled. I agree with you. But if we have to apply Humphrey's, which we do, we also have to apply Myers. And when there's tension between Humphrey's and Myers, we have to try to reconcile that tension. When there's Humphrey's, when there's tension between Humphrey's and Steele and Collins, we have to try to reconcile that tension. But I don't understand why you said we have to apply Humphrey's and Wiener, and you just kind of stopped there, as if Myers and Collins and Steele don't exist. Judge Walker, I'm not pretending Myers doesn't exist. The Supreme Court said in Humphrey's executor that Myers is restricted to the specific facts that were presented in that case. It says that in Steele's law, that Humphrey's is restricted to its facts. It did not say that, Judge Walker. It did not at all. I disagree very strongly, and I think this is critical. Steele's law, Judge Millett, you're absolutely right, said time and again that multi-member bodies were okay. That's why. They were okay if they don't wield, and I agree, and they did not literally say it's restricted to its facts, but they said that multi-member bodies are okay if they do not wield substantial executive power. And Judge Walker, how we determine substantial executive power is by looking to the bodies where the court has said these are, it's glossing those precedents. You have to look. I think I'm asking a more basic question. Do you agree that that's the test? Yes. Okay. And then do you, and I know you believe, I know you argue that the MSPB does not exercise substantial executive authority. That's your argument, right? We know it doesn't, Judge Walker. You speak highly of, I know, and you've briefed why you say you know it doesn't. In the PHHH dissent, which was later vindicated by the Supreme Court, Justice Kavanaugh said the Merits System Protection Board exercises substantial executive authority. I know. Was he wrong? I think he was, and let me explain why. First, we know that adjudication is squarely within the Humphrey's executor framework of what is constitutional, and the Merits System Protection Board hears discrete cases, for example, of partisan discrimination and whistleblower retaliation. So, for example, if a Democratic president fires, say, somebody at the FBI or DHS and says, I don't like who they voted for, or I don't like the person they donated to, then you can go in front of the Merits System Protection Board and you hear those kind of discrete cases. That's all it does. It's an adjudicator, and the president gets to pick his prosecutor. That's the point of the Dellinger order. President doesn't get to pick his judges, and the Congress, which is the people's representatives, have enacted a law, which is squarely within the Humphrey's executive framework, to say that these types of neutral arbiters have a measure of protection, because otherwise they can't decide cases free of fear or favor. And Judge Henderson, I think one of your initial questions, beginning to my friend on the other side, got to the sweeping nature of executive power here. If my friend on the other side is correct that the president can remove everybody in the executive branch at will, that means that Judge Walker Marbury was wrong, because in the William Marbury was not, his commission was not removable at will. It means Perkins is wrong, because it means every employee and inferior officer in the federal government can be removed at will. And it means Myers is wrong, because even in Myers, the high watermark of removal, the court recognized that Congress had this historic authority to regulate the removal of members of the civil service. If I could, I would like to touch- Chief Justice Marshall's dicta that some officers are not removable at the will of the president. They called it ill-considered dicta. I think that Perkins is not an ill-considered dicta. And it's very clear that Perkins is a straight holding. And in fact, Justice Scalia recognizes- We are a lower court. We are bound by SILA, which came after Marbury. Just to be clear, the holding of Marbury, very, very good law and the most important holding in the history of the Supreme Court. But as far as the ill-considered dicta in Marbury that you are relying on, we are a lower court bound by SILA, which called it ill-considered. So, Judge Walker, you would have to overrule Perkins and Myers. You'd also have to overrule SILA to rule for the government, because under the government's theory, there's nothing left of Humphreys. Under the government's theory, Humphreys is literally a case about one guy named Humphreys and his estate. That is their effective reading of that decision. That's not a fair reading, Judge Millet. You're absolutely right of the Chief Justice's decision. I think that what he said is Humphreys represents the outermost constitutional limits of permissible congressional restrictions on the president's removal power. And what that means is we apply Humphreys, but we do not extend Humphreys to new contexts. In some ways, it's similar to Bivens. Bivens is still good law. And if it's the same context as Bivens, then we recognize the Bivens action. But we don't extend it to new context because of what the Supreme Court has done in the 45 years since Bivens. And the argument you're making about Humphreys, if we translate it to Bivens, it would have us treat Bivens as if this is 1978 and not 1925. I disagree, Judge Walker. And let me take the Bivens analogy. I think the analogy under Bivens would be to say that if your name is Bivens, you have a cause of action. But if you have the exact same Fourth Amendment claim, you can't bring it. And we know that's not right because the Chief Justice didn't say Humphreys is only right for the FTC. The Chief Justice said, we are not disturbing Humphreys, any other precedent. And they left in place an exception. And we know that from Justice Thomas and Justice Gorsuch's concurrence, where they were very clear they would go the next step and throw it all out, that they left in place an exception for multi-member bodies. And by the way, every single court of appeals to have heard this argument, including this court in META, including the Tenth Circuit, including the Fifth Circuit in Judge Watt's decision, every single court has rejected it. And you are here, Judge Henderson, on an emergency stay. And what that means is the government does bear a strong burden of showing success on the merits. They can't just come in and say they have a theory. They have to come in and convince you that they are ultimately so right that they deserve extraordinary relief. Now, how certain do you think we have to be? I mean, I asked you this earlier. I'm not sure what the answer was. And I genuinely am disinvited and curious. So Judge Walker, I think we have to be 51% certain? So Judge Walker, I think it's 51% I don't think would be, because that would just be more likely than not would be the same standard you would use at the merit stage. So it can't be that. But I don't think- It could be more of it. So I think it has to be more, right? Because it's clearly a strong showing. It has to be more than just you think ultimately that the government's likely to prevail. But the point I'm trying to make is the court has never tried to quantify that before. And I think that Judge Posner has a decision where he said, I know how to do hard review and soft review. I don't know how to sort of quantify reviews in the middle. And so I think at one level, I give Judge Posner's answer, which is, I can tell you there's hard review and soft review, and this is hard review. You have to look and say, are they so right that they deserve this extraordinary relief? And if I could, I think it might be helpful. To follow up there, I think Judge McConnell said when he was on the bench that stays in the bench. Conjunctions pending appeal. We're not supposed to change the world in advance of adjudicating the merits of a case. And so the reason we have, we require a strong showing of a likelihood of success on the merits is there has to be a justification for us to jump ahead of our normal processes of full briefing, full deliberative consideration, not on the compressed timeframe we have here, and then we decide the legal question. Whereas here, a stay would not decide the legal question. It would just make a prediction. And that's why we only use stays to preserve the status quo and not to turn it upside down. So how does that factor in your answer to Judge Walker's question? It factors in, and I think it's telling here, the government is not seeking to preserve the status quo. They are seeking to massively disrupt it. And they are in two respects. The first is that no president in history has ever done this since Wiener to a member of a multi-member body. And we know that the government's argument that it needs some extraordinary relief doesn't bear out how they've acted in this case. They waited Judge Millett weeks when this case was pending in the prior appeal in this court and never filed for emergency relief. They never filed in the Supreme Court of the United States. They now have an acting OSC. So they control that process. And the status quo is these people remaining in office. Member Harris remaining as an adjudicator on this board. She is a member of the board. She's protected by four cause removal. And it massively disrupts the status quo. And in fact, will result in a loss of a quorum to remove her from office. And Judge Henderson, you asked about a loss of a quorum last time. The last time there was a loss of a quorum, it resulted in 3,800 undecided cases that the board under Member Harris and Chair Harris's leadership only just cleared. It was a massive disruption to the public interest. And I would stress, by the way, and I think it may be helpful, Judge Henderson, to talk about irreparable harm, but I want to stress as well that we can't skip over that likelihood of success factor. So if you think that the government can't prevail on the likelihood of success factor, that's at one level of the end of the story. You can't then go beyond. The government can't go beyond and say, well, we fail on likelihood of success, but we still want emergency relief. If I could, I'd like to briefly touch on remedy, because Judge Walker, I do think they are trying to get you to overturn Marbury. The core holding of Marbury was that the court could have provided a remedy, right? That's the purpose of an article-free court. And we know that courts going back to Blackstone and discussing English courts, rude to the various citations they are giving this court, from Inouye Sawyer and White P. Barry, all say that the writ of mandamus was available here. And in fact, I heard my friend on the other side concede that relief is available under Swan. So if relief is available under Swan, and that's precisely what we received was injunctive relief there under Swan and Severino, then they also cannot make that strong showing, Judge Malauulu, likely success on the merits, if they've conceded that injunctive relief is available. And if there is an extraordinary long history dating back to England of courts providing mandamus- On the status quo question, what do we do with the statement in the Ken stay simply suspends the judicial alteration of the status quo? So I want to be very clear, Judge Walker. I don't think, and I take Judge Mallett's point that we normally provide the say to prefer the status quo, and the court has said sometimes it's tricky to determine what the in this case, no president has ever- Have we said it's tricky, or do we have a clear definition, which is the last uncontested status between the parties? So Judge Malauulu, I'm not a trial lawyer, but my guess is that's a leading question. So I think that that would be the last uncontested- If you had a president that said that, that would bind the- That would bind you. That would bind you. And so that would be my answer, Judge Walker, to that question. But I mean, I know we have precedent that says as a general rule that for us to issue a preliminary injunction, for us to order the district court to issue a preliminary injunction, as a general rule, the status quo is what Judge Blatt just said. We're not ordering a preliminary injunction here. We're considering whether to order a stay. And I think if there's a conflict between our precedents and the Supreme Court's, we go with the Supreme Court's, and the Supreme Court said a stay simply suspends judicial alteration of the status quo. This court has also said, and the Supreme Court has also said, that a stay is an extraordinary remedy because it disrupts the normal judicial process. And I think that the government still has to show that extraordinarily high burden, regardless of whatever it may be, it's 51%, 99%, somewhere in between, Judge Walker. It's an extraordinarily high burden. We know that. I'm confused because the question is, do we have- we can use a stay if there's been a judicial alteration of the status quo. But if, under our standard, the district court here preserves the status quo- And also, I'd point you- It wasn't clear. Were you conceding? I'm not conceding. I'm not conceding, Judge Millett. I'm not. I do think that that is an alteration of the status quo. And part of the reason that the president's removal was- It was or was not? It was not an alteration. The district court is keeping it in place. But part of the reason we know that it's keeping the status quo in place is because in CalPERS, and this is, I think, critical on the question of where the status quo lies. CalPERS is a decision from this court in 1914. It involves mandamus relief. And what the court says in CalPERS is that the officer remained in office, that the removal was not affected. So this is not a case where someone is being put back into office. It's simply a recognition, Judge Millett, as you noted in the Severino case, that that person is in office. That's why they're de facto being treated as in office. It's because under CalPERS, they've never been removed. And Judge Henderson, I do think that the extraordinarily long history and tradition of courts providing relief to officials in precisely this context underscores why there is irreparable harm if they are removed from office. It'd be like if a judge was told, an Article III judge was told, you're removed from office, you're barred from your chambers, but you're receiving back pay. I don't think anyone would think in that context that the back pay would remedy the extraordinary injury to an Article III adjudicator who was nominated by the president and confirmed by the Senate. If I could... If there's no more questions, let me just... Any more questions, Judge Millett? No. All right, go ahead. I'm sorry, I still apologize. I have a quick one and I will want the government's answer. I'm sorry, I forgot to ask you as well. Regardless of our stay decision, do you want an expedited or a highly expedited appeal? We would agree for an expedited appeal on the merits, which I think would also alleviate some of the government's concerns, Judge Millett, regarding sort of the vague separation of powers harms. That's if the stay were granted. Well, I think we'd obviously like an expedited appeal there. I would ask, I think it might be helpful to administratively stay the stay, no puns intended, in part because just given the flip-flopping disruption that that might occur if we then receive another stay, that it might make sense just to pause, press pause on any stay order for a minute if there is further...  From this court, yes, if there is further review of that order from the special panel potentially. So I just throw that out. Did you ask the district court to do that when they gave you the relief that you wanted? We were never removed from office under CalPERS. We had an absolute right. And so I don't think it's necessary, Judge Walker, for us to ask the district court for that. And I would add, by the way, the government's own behavior showed that it didn't think that was necessary because the district court, unlike in Dellinger, Judge Walker, where the district court immediately went up to the special panel and then immediately went to the Supreme Court, the government took an appeal from that TRO and then sat on it. So I don't think the government even thinks that this was, from their perspective, so critical that they needed immediate relief. We can ask them how big a hurry they're in. Thank you. If there are no other questions, we'd ask that you deny the motion. Thank you. All right. Mr. Gupta. Thank you. And may it please the court, Deepak Gupta, on behalf of Gwen Wilcox, a member of the National Labor Relations Board. I want to start up with the standard. Stay pending appeal is an extraordinary remedy that demands a strong showing on all factors. And the court has repeatedly emphasized that likelihood of success is the most important factor. Judge Walker, I don't know the exact percentage, but I think 51% is sort of ordinary likelihood of success. So if it's a strong showing, it's got to be considerably more than that. And I think precedent should be the guide. I think, as my colleague mentioned, the fact that every circuit that's been confronted post-SALA law with the question of, you know, what's left of Humphrey's executor for these traditional multi-member bodies has said, it's not our prerogative to overrule the Supreme Court's precedent. That question will probably reach the Supreme Court. But as Judge Willett put it, you know, middle management judges in the circuits don't take for themselves the prerogative of anticipating the Supreme Court's potential overruling. So I definitely agree with that. And then I think he would agree that we can't read Humphrey's in isolation, right? Right. Or Wiener. We have to read Humphrey's and Wiener in the way that SILA and Collins told us as lower courts to read Humphrey's and Wiener. Well, I don't think, I don't read SILA as saying, here's a new framework for Humphrey's and you should engage in a kind of agency by agency analysis that is different from what has prevailed up until SALA. What I read SILA law is doing is saying, we are not revisiting or overruling Humphrey's even though we've been invited to do so. And even though some of the dissenters would do so, they've rejected that. And I think if you read the thrust of the opinion, it is contrasting the novelty of the single director agency with the traditional multi-member body. One of the first opinions about single director agencies was first the panel decision and then this court's en banc decision in PHH. And as you heard me mention to Mr. Zielinski, Justice Kavanaugh said about the MSPB, but he also said about the National Labor Relations Board, it exercises substantial executive authority. We have to disagree with Justice Kavanaugh's statement in order to agree with you, correct? I do disagree with that statement. And I think that statement is wrong. I don't think you need to do that to rule in our favor, because I think that anticipates the merits and probably anticipates the question that ultimately reaches the Supreme Court. Because the through line in SALA law is the emphasis on the historical, traditional understanding that counts for a lot in separation of powers. And so for the majority of this country, we have had multi-member bodies like this. And it started, the Interstate Commerce Commission is a multi-member body that actually had a lot more substantial executive power than the NLRB does. And it has, therefore, caused removal protection. We had it before the 1880s? I think you had Article I courts that are, as you've written, are housed within the executive branch, but that doesn't mean that they have been considered unconstitutional because they were wielding executive power. And I think it's important when we're- And the answer may be yes or no. Did they have, were there removal restrictions on them? They are. They do have removal restrictions, yes. And so does the Interstate Commerce Commission. That's all in the 19th century. And then I think Humphrey's executor- I think he predated Myers, right? It did, yes. And then Humphrey's executor builds on top of all of that. And the National Labor Relations Board was created by Congress two months after Humphrey's executor in reliance on that, modeled on the arrangements that the Supreme Court had just sustained. I get that. And if we were deciding this case two months after Humphrey's, it might be this would be an easier case. But do you think we're supposed to decide this case as the state of Supreme Court jurisprudence stood two months after Humphrey's, or as it stands today after CLN Collins? Surely as it stands today in 2025. I think we agree on that. And then the question is, what does SALO law instruct lower court judges to do? And I think I would look at what your colleagues across the circuits have done. I think that counts for a lot because those are decisions not in an emergency safe posture, right? A panel was sharing a full argument on the merits. The question is, even when a precedent is binding, there's often debate and difficulty about how broadly or narrowly to read it. Surely. And would you concede at least that after SILA and Collins, we read Humphrey's more narrowly than we would have before SILA and Collins? I don't think so. I don't think that's what SILA and Collins are instructing the lower courts to do. And I think that's partly what surely the court meant when it said we're not revisiting or overruling those precedents. I think what they said were not overruling precedents meant there's something of Humphrey's left. And I recognize there's some things of Humphrey's left. But I think if you have Humphrey's here, and then you've got the text of the constitution, early originalist history, the tradition of the first hundred years up until ICC and then the 1930s, pushing against reading Humphrey's broadly. And then you've got Free Enterprise Fund, and you've got SILA, and you've got Collins pushing kind of the other way, squeezing Humphrey's, make it narrower than it might otherwise be. It's almost like the trash compactor in Star Wars. You're still alive, but Humphrey's is getting narrower and narrower. So I think when we say that it is the prerogative of the Supreme Court to decide whether to dispense with its precedent, I think part of that entails teasing out whether there are tensions in the existing case law that require a change in that precedent. And I've read your opinion, Judge Walker, in Severino. And so I suspect that if we were starting from first principles, you and I might disagree on where it would all shake out. But we don't have to have that debate here. My friend conceded to you all that these two agencies are predominantly adjudicative. He was right to concede that. And I think with respect to the NLRB, I just want to make it really clear, because I don't think it comes through in the papers, the NLRB is a unique institution where Congress went back in after 1935 and ensured even more separation. It ensured that the president has the ability to remove the general counsel. That officer serves at the pleasure of the president and oversees all of the attorneys, all of the investigatory and prosecutorial functions. It is as if that is a different agency. In fact, Congress considered giving that agency a different name. It instead calls all of it the National Labor Relations Board. But it's very different from a scenario in which you have one agency with a multi-member board at the top, and it's wielding all of that executive power. In fact, that executive power resides in the general counsel who has been removed by the  The president is named a new person. And the board, so now I'm talking about the board members, not the agency we call the  Those board members are appellate adjudicators. They decide cases much like you decide cases in panels of three, and the cases come to them in an appellate capacity. And so they were right to concede that it's predominantly adjudicatory. The board is almost exclusively adjudicatory in its functions. And so it sits within the heartland, not just of Humphreys, but Wiener. And so I think this is a particularly poor test case to be asking you as circuit judges to anticipate that the court would dispense with that framework, because if there's anything left of the framework, we fall within the heartland of that framework. And I think the government. I would have thought the framework is what SILA said the framework is, which is, is this a multi-member expert agency that does not wield substantial executive power and then maybe sometimes it's harder than other times, but we would have to figure out is this is this agency wielding substantial executive power. Right. And so what I would submit to you. It's not. And I think there are two versions of the way that the government is using executive power in their papers and the argument. And I just I want to distinguish them. I think it's very important. One way is to say simply because something is housed within the executive branch. It's necessarily executive power. And so it fails the Humphrey test. If that's if that's their position, and I think there are flavors of that in their briefing, then there's nothing left of Humphrey's. And it would be hard to say that even the Federal Reserve Board is constitutional or even Article One courts are constitutional, and they recognize that that is an extreme position. So they attempt a historical justification for the Fed. Then another way to understand the. Sorry, go ahead. Another way to understand this, and I think this is in Saliala itself is Saliala distinguishes between executive power in that sense, which is nearly housed within the executive branch and in an executive function. And I think this is what is left of the Humphreys framework. The Humphreys framework looks at the functions that the agency is engaged in, and that's why that concession that this is a predominantly almost exclusively adjudicatory body is fatal, at least here. It might not be fatal ultimately in the Supreme Court after full briefing and argument, but it should be fatal here, given the high standard for a stay pending appeal and given this court's obligation to follow existing framework rather than to anticipate what weather precedent might ultimately be overruled. So how much executive authority does an agency have to wield before the Humphreys, before it fails the Humphreys standard, as Sheila and Collins interpret the Humphreys standard? So I think if it is a traditional multi-member body of experts that is tasked with deciding or adjudicating cases in a nonpartisan manner, then it will easily succeed under the Humphreys test. If, however, it's an agency that is engaged in prosecutorial functions that are unsupervised by the president and is wielding the kind of power that the court was discussing in SALA law, where you're supervising the entire economy, you're writing rules, and as Judge Millett mentioned, you can take actions that become instantly enforceable even without Article III courts, that's a very different scenario. And I do want to make clear that is true of the CFPB. It is not true of the NLRB. And I'd recommend a decision by Judge Oldham in the Fifth Circuit called Dish Network, where he explains that the NLRB is unique. In fact, he says the NLRB may be the only agency that needs a court's imprimatur to render its orders enforceable. The board is given no power of enforcement, and he says what was true in the 1930s about the NLRB remains true today in that respect, quoting a case called In Re NLRB from 1938. So the NLRB is actually uniquely non-executive, doesn't have that enforcement power to the extent that there are prosecutorial or investigative powers. Congress made those powers supervised by somebody that the president can remove and who serves at the pleasure of the president. And instead, what you've got is a pure adjudicative body like you don't even have to look at Humphreys. You can look at Weiner, where you have a commission. And differently from the Warp Commission, which wasn't reviewable by Article III courts, everything the NLRB does is reviewable by Article III courts, as this court well knows, because you review actions of the NLRB all the time, maybe more than you would like. And so this case falls within the heartland of Humphreys. And you and I might, we might have different views on how this will all shake out ultimately, but I don't think that is the way that a stay motion should be decided. And I do think the government cannot, as my colleague said, just skip over likelihood of success, because I think this court's precedent has been clear that that's the most important factor in this analysis. They have to show you not just the likelihood of success, but a strong showing of the likelihood of success. And surely that means that their position doesn't require dispensing with settled precedent. What about the sort of injury to the president's power here? Right. So I'm jumping to irreparably. Right. And on irreparable harm, I do want to make clear that this case stands on a very different footing from Dellinger. I think in that case, the court rightly cited the harm to the president sidelining his acting person who had been there and the need to work with the special counsel, who of course is antagonistic to the president. In this case, what you're instead talking about is whether or not this multi-member body that adjudicates the claims of private parties, not the executive, whether it has a quorum or not. The president has no legitimate interest in disabling this body created from Congress from performing its functions. He does have a legitimate interest as a new president elected by the people of putting his stamp on the agency. He does that by naming a new general counsel. He does that by naming the chair, which he has done, and he could do that, hasn't done so yet, by naming people to the two vacancies. All of that would put his stamp on the agency and allow it to function in the way that he would like, but what he does not have an interest in doing, a legitimate interest, is depriving the agency of a quorum. All we're asking is that by allowing- They say every day he can't remove somebody is irreparable harm because it impedes upon, steps upon his removal power. That very abstract conception of irreparable harm, I think, fundamentally relies on a view that they are right on the merits, and it also, it doesn't- Humphreys and Weiner and Celia Law, these portions of it, are still binding on us. Right. And it's still there. Supreme Court has said it's not a constitutional injury. Right. I think that very- Constitutional injury there, it can't be an irreparable harm analysis. Right. It's sort of like when people rely on First Amendment or separation of powers, harms, it's a very, very abstract, the thinnest notion of harm. The answer to it is that it's an injury we can't recognize until Humphreys' executor is overruled. I think both. Right. It critically depends upon the argument that they have a likelihood of success. Once you've done- Humphreys' executor controls this case. Everybody agrees that Humphreys' executor has not been overruled. Yes, I mean, I would say, and just to the colloquy you had earlier, Humphreys' executor and Celia Law, the whole body of precedent in 2025, right? And Collins. And Collins, yes. And Collins, and Weiner. We run it through all of the precedent. But if all I'm saying to Judge Millett's question about the harm is that this abstract argument that they're making depends upon the likelihood of success. And then I think, in contrast with that, you've got the fact that my client, if she is ejected, if she does not have the ability to stay in this office, is deprived of her ability to perform the role that she was assigned by Congress and by Senate confirmation to a duly appointed role. And that also works a great harm to the public interest. Because again, I don't think the government has a legitimate interest in depriving this agency of a quorum. It is the only place where these claims are adjudicated. That deprives private parties of the private parties. I know you think that the statutory removal provisions are constitutional. If they are not constitutional, then would it be legal for the president to fire Ms.  I think you're asking a very simple question. You're saying, if we lose on everything, and the statute is unconstitutional, does the president have the ability? Yes, of course. And if the provisions are unconstitutional, they were always unconstitutional, right? They were void ab initio, right? Yes. I think that's the right way to think about it. And I do think these are simple questions, but I ask because the district court said that the president's action was blatantly illegal because the statute prohibits it. Well, if it's an unconstitutional statute, then a statutory prohibition against it is not something that would make it blatantly illegal. Yes. But I do think- Why do you think she said that? I think because it's obviously a clear violation of the text of the statute. These statutes have been around for nearly a century, and presidents have not gone around violating them. And that's because there's a settled interbranch understanding. And we call that Humphrey's executor. We call that Wiener. But Congress has relied repeatedly on that understanding and structuring and creating these agencies. And I think cellular law said, we're going to confront this question about a novel set of arrangements in which all of this power resides in a single individual. But what we're not going to do is do a massively disruptive thing of unsettling all of those arrangements upon which Congress has relied. And this is the prototypical one, right? It does matter that it was enacted two months after Humphrey's executor in clear reliance on that precedent. They've conceded an adjudicatory body. And so I think if Humphrey's executor and Wiener mean anything, it means that these bodies, at least under present law, are constitutionally structured. And the removal was unlawful. So the district court, I think, was right to say it was blatantly unlawful in that sense. Again, you don't have to agree with me. Not as you believe the statute is constitutional. And you don't have to agree with me about where that ultimately shakes out after the Supreme Court hears briefing and argument on the question to agree with me that under existing settled law, that an extraordinary stay motion is not the right time to be anticipating that overruling. And if I can just return to the question of irreparable harm. And I realize I'm running out of time. I do want to point out that the government is relying on cases from the 19th century and treatises from the 19th century that say that courts of equity in the days of the divided bench didn't grant the kind of relief that we're talking about here. But if you look at those cases and you look at those treatises, almost everything they're citing, the very next sentence says, and that's because these remedies were available at law. And they were available through mandamus. And in fact, in the late 18th century, Blackstone makes this clear. The principal function of mandamus was to do precisely what the district court did here, which is to ensure that somebody who's been unlawfully removed from office can remain in that office. Discussion about standards and level of certainty that's necessary. Mandamus has an extremely high standard, correct? Yeah, and I think this court's decision in Swan addressed all of this in some detail, not just footnote one, but the discussion that talks about how, at least if there is, and in that case, the court ultimately concluded that there wasn't such a non-removal duty, right? But the court said where the statute, even if the text in that case didn't demand it, once you establish that there is that non-removal duty, it creates the sufficiently clear duty that it is correct to characterize that relief as available at mandamus. And of course, that's what Marbury versus Madison is about. There's a long tradition of providing that kind of relief. And so I think both on the likelihood of success on the merits and on the remedy, we are squarely within precedent, including this court's precedent. And the appropriate thing to do, therefore, would be to deny the stay, but to expedite the briefing and allow this appeal to take its due course. Thank you. So you would agree to expedition, is that all you said? Yes, we do. And if they were granted, what would your view would be? How fast would it go? Fast, yes. I think I'd probably want to speak with counsel on both tables before I take putting a position in writing on that. But I think everyone would agree that expedition would be appropriate. Thank you. All right, thank you. Mr. McArthur, why don't you take a couple minutes? Thank you, Judge Henderson. I just have two main points that I'd like to leave the court with. One about the remedy, the reinstatement remedy that was ordered below, and one about the scope of Humphrey's. And I'll preface this by saying that, Judge Walker, I did a little math myself, and someone should definitely check my math. But the math that I did, we have these two grounds on which we can prevail on the merits. I said, well, what if we had a 40% likelihood of success on each on its own? I think the math in that situation says we have a 65% likelihood of success overall. That is how I think you should be thinking about this. Both grounds give us a path. You don't even need to be across 50% on any issue, and you have a substantial likelihood, a strong showing of substantial likelihood. I think that's what it means to have two independent grounds. So on... No, I'm talking about likelihood. All right. I'm having... I was told there was no math in this job. But likelihood seems to be 51%. I think you just said you could be below 50% on both issues, and still you get to claim that you are likely to succeed. Someone with a math degree should definitely double check my math, but I think that's how the probability shakes out, 40%. That's the Justice Department's position. Would that be applied by people who are seeking stays that you oppose, that it's fine if they've actually got a loser on two issues, if they lose? If you've got independent grounds that both get you the relief that you need to get a stay, which, again, the relief that we want here is that they're not occupying those positions. That's your claim for how you have likelihood of success. I think we've got a strong likelihood of success on either ground. My point is that it's even stronger because we have two independent grounds. So on the remedy... Neither of which is over 50%. You think that each is about 50%. I do. I do. It was just a hypothetical that if we were under 50% as to each, what would the likelihood of success on one of them be? There's a 60% chance of being wrong times a 60% chance of being wrong is only a 36% chance of being wrong. I don't think I followed that. I don't get that.  On mandamus, on the remedy, the only remedy that they can get here that gets them to official reinstatement, which is what the courts below ordered, is mandamus. And it's the same standard that this court in Swanson had to be met even for the lesser remedy of de facto reinstatement. They cannot meet the stringent standard for mandamus because they do not have a clear and indisputable right to relief. In whatever you think of the scope of the Humphrey's executor exception, there is at a minimum, a very substantial question about that. Take a look at the Fifth Circuit consumer's research case, where eight judges joined Judge Oldham's opinion, setting forth essentially the same view of the scope of the Humphrey's executor exception as we are advancing here. This is a question on which reasonable minds can differ. And that is not the stuff of mandamus. In fact, there is a reason why. I'm just trying to, you know, you started and I appreciate the candor or recognition that, you know, the Supreme Court has left things foggy and hasn't sent a clear message. The courts of appeals, one way or the other. And we could sit here all day, picking out which parts of the sealer law we want to point to and have discussions about that. But are we agreed that the Supreme Court has not been clear as to, I mean, it's crystal clear Humphrey's executor is precedent. Weiner is precedent. That's never been overruled. Is there clarity that you see that you could point me to as to how much, what that means for an adjudicatory or, as you said, predominantly adjudicatory body? Predominantly means that, again, in my math, that to the extent there's other executive-ish things you want to characterize as executive or legislative, those are way less than the adjudicatory role. I think the clearest thing I can point to, point you to, Judge Follett, is the analysis from SELA that says if it's an executive body that does not wield substantial executive power in SELA law. And this is the point that I wanted to leave you with on the scope of Humphrey's executor. One of the things that SELA law told us about Humphrey's executor, how we should be reading it today, is that we should take it on its own terms and not how it has been understood subsequently, but based on its own terms. And if you look at Humphrey's executor, I think the analysis that the court was employing there was envisioning executive power to be on a spectrum. And on one end of that spectrum was a mere legislative or judicial aid that exercised no executive power, which is what the court thought the FTC was. On the other end of that spectrum was a purely executive officer, as in Myers. The court said between those two poles is a field of doubt that we are leaving for resolution for another day. What has happened over time is that Congress has gone farther and farther into that field of doubt and given tenure protection to agencies, unaccountable agencies, that wield more and more executive power. You got Weiner after that, not too long after that. That's right. That really was adjudicatory body.  It was doing an adjudicatory process while performing an executive function. That's right. And Weiner relied... Process while performing an executive function, and that was unanimous. That's good. That is good. And Weiner relied on, in the words of the court there, the philosophy of Humphrey's executor. That philosophy has been repudiated. I take the lesson of the court's most recent cases in this area to be in that field of doubt, we're drawing a line. Where have they talked about Weiner? What have they said about Weiner? Well, they acknowledged Weiner in Humphrey's executor. I think that was... I mean, in CELA law, that was part of the analysis. They discussed both Humphrey's executor, and then they discussed Weiner, and the chief justice distilled it down to a test. Does the agency wield substantial executive power? Neither Humphrey's executor nor Weiner said. Any agency that does predominantly adjudicatory functions can be given tenure protections consistent with Article II. What counts as substantial? What is your position on what counts as substantial executive power? Well, I think that is a slippery inquiry, and maybe why the court in Collins on second thought jettisoned it, but if you have to think about it, I think there are a couple of ways you could come at it. One would be to say... I didn't see what you said, Collins. Just so your view isn't the test. The test isn't substantial. I think there's some uncertainty about what Collins did.  I mean, this is something that your honors recognized didn't stay on. You think that in order for there to be a legitimate removal restriction, there has to be at least substantial executive power, and it may well be that any inkling of executive power would do the restrictions. I'm happy to go with the substantial executive power test. I'm trying to understand what you said. Collins said the test is no. I'm saying what your honors said in the stay opinion in Dellinger, which is that Collins expanded CELA law by saying that the constitutional inquiry doesn't depend on this parsing of the relative importance of authorities. But what do you think... That doesn't go to... That was a different issue from what the legal test is. Is that after Collins is the legal test that Walker has proposed. I can tell you... Substantial executive power. I can tell you that both dissenting opinions in Collins read the majority opinion to be dropping that substantial executive power test. What does the Justice Department say? How do you read Collins? I read Collins to say at least in the context of a single headed agency, they're not going to ask whether it's substantial executive power and do this sort of comparative inquiry, because they said that courts are not suited to do that. So then the question is, does that same analysis apply in the context of a multi-member agency? I don't see a reason to think that courts are any more equipped to do this parsing of authorities in the one context or the other. We're not touching the executor. So what is left of Humphrey's executor if we can't even do the substantial executive power test? I think you're looking at whether it's substantial executive power or executive power that goes beyond the powers that the court considered as the basis for its decisions in Humphrey's executor and Weiner. We went under either one of those tests and neither of those decisions said that if it's predominantly adjudicatory, it's necessarily okay to give them tenure protection, no matter how much... I think predominantly adjudicatory, predominantly as they call it quasi-adjudicatory were exactly the words in Humphrey's executor and Weiner. That's right. And that's the part of the reasoning that has been repudiated. But neither case says you can go tacking on additional executive authorities and still get tenure protection. And both agencies here have significant additional executive power. What adjudicatory agency would be constitutional? What removal protections would be? Is there anything? I don't know what adjudicatory agency. I think there are agencies that would fit within the Humphrey's executor exception as clarified by CELA law. For example, the one that the court considered in Severino, the Administrative Conference of the United States doesn't exercise power. It serves a purely adjudicatory or purely advisory function. So I think that could fit within the Humphrey's executor exception. So if they don't do, they're just advisory. But you can have removal protections on the president's advisors? Within that right? An advisory body like the Administrative Conference of the U.S. I think that would be. In your position, that's interesting. Okay, thank you. Am I right that in the DOJ's brief in Severino several years ago, they said a removal restriction would be constitutional because ACUS does not resolve or commence matters for the executive branch or determine anyone's rights or obligations. That was the test of the previous DOJ. I haven't looked back at the brief. I'll trust that your honor is reading it correctly. But as I understand that body and that this court understood it in Severino, it wasn't exercising any power over the rights or obligations. Resolving matters for the executive branch or determining anyone's rights or obligations. I think here, probably, you know, regardless of any disagreement in the courtroom today, I think maybe everyone here would have to concede the MSBB resolves matters for the executive branch. Absolutely. The test. How can we adopt that test without saying Humphreys, which did much more. The FTC did much more even then. And Wiener, War Commission, did much more than that. Still exists at all. There's nothing in either of those decisions that fits that description. So how is it the business of this court to say there's nothing that was right about Humphreys' executor? There is nothing that is right about Wiener. That is not our position. Our position. Nor was that the position of the previous DOJ that articulated the test that I just read to you.  They weren't voting for Humphreys' executor. Does that test, does the FTC at the time of Humphreys' executor fit that test? Remind me what the test is, Judge Walker. And again, I'm not necessarily proposing this test. Not saying, I'm not quoting from Steele or Collins. I'm quoting from the Department of Justice from several years ago. I think it was 2022. And it said, ACUS does not resolve or commence matters for the executive branch or determine anyone's rights or obligations. Nope. Can't fit that into Humphreys' executor. I think the FTC and Humphreys' executor resolved and commenced matters for the executive branch. Exactly. Exactly. So, that can't be what? Our fundamental submission, again. So, if ACUS, that's the one thing you're able to think of. That can't be the test, though. That is purely advisory. Or it certainly can't, Supreme Court can do whatever it's going to do. At our level right now, where we have to leave Humphreys as precedent. So, it has to be, whatever test it is, it has to reach the same outcome as Humphreys did and neither did on its facts. I agree with that. So, do you have anything? I think the test you should be applying is whether the agencies before you exercise substantial executive power that goes beyond the powers that the court considered as the basis for its decisions in those two cases. And both agencies here do. We should apply the jettison test, the test that Collins jettisoned, you told me. I think you can think of it either way. Or going materially beyond the powers that were considered as the basis for the decision. And we went under either test. Did you want to address the stay issue? Or the expedition issue? Yes. I think we all agree that there is a compelling interest in resolving these matters swiftly. And so, I'm sure that we would agree to an expedited schedule. I don't want to agree to any specific schedule. Do you want a specific, like, expedition, like, argued in May? Or are we going to wait until September? I think it would be preferable to have argument before the court recesses for the summer. And there is just one additional point that I want to make about expedition here. And that's to respond to Harris' claim that we somehow sat on our hands in bringing our appeal in Harris. The reason we did not pursue the original appeal that we took in Harris is because we had come up on Dellinger and the court had told us that a TRO is not an appealable order. And that's what we had in the original appeal in Harris was the TRO. And so, we waited until we had an appealable order and we came up as quickly as we could get here and asked for a stay. We certainly did not sit on our hands. All right. Let me just say that it's not a matter of May or September. We've heard plenty of these during the summer. So, let me just put that clear. All right. Counsel, thank you for your arguments. And Madam Clerk, if you would give us an adjournment.
judges: Henderson; Millett; Walker